# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBEN GARCIA HINOJOS,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>Defendant. | 1:11-cv-01530-SKO<br><br>**ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT**<br><br>(Docs. 1, 12) |

## BACKGROUND

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for supplemental security income ("SSI") pursuant to XVI of the Social Security Act. 42 U.S.C. §§ 401 *et seq*. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. (Docs. 5, 10.)

# FACTUAL BACKGROUND

Plaintiff was born in 1967 and previously performed janitorial work. (Administrative Record ("AR") 27, 42.) Plaintiff filed the current application for SSI on May 18, 2007. (AR 27, 188.) Plaintiff asserts his ability to work is precluded by hepatitis C, mental problems including depression, and pain in both knees. (AR 193.)

**A.    Medical Evidence**[2]

On May 1, 2007, Plaintiff was examined for complaints of depression and social anxiety by Archana Banerjee, M.D. (AR 267-69.) Plaintiff reported that he had experienced feelings of depression over the last few years which was gradually worsening and had motivated him to seek treatment. (AR 267.) He reported feeling sad most of the time, lacking motivation, and isolating himself from family members and friends. (AR 267.) He stated he was lacking energy, experiencing insomnia, lacking concentration, suffering from poor memory, and feeling hopeless, worthless, and anxious. (AR 267.) Plaintiff reported past suicidal ideation, but denied feeling suicidal at the time of the examination. (AR 267.) Plaintiff also stated that he had abused alcohol and heroin in the past, but that he had been sober/clean since 1998. (AR 267.) Plaintiff reported that his brother's wife and three children had been killed in a fire in 1994, and that he had not been working for the three years prior to the examination due to his subsequent depression. (AR 267.) Dr. Banerjee diagnosed Plaintiff with major depressive disorder, moderate with no psychosis, and a social anxiety disorder. Plaintiff was assigned a Global Assessment of Functioning ("GAF") score of 45, and was prescribed Celexa for depression and Hydroxyzene for insomnia.[3] (AR 268.)

On October 28, 2007, Plaintiff underwent a comprehensive psychiatric evaluation by an agency compensation examiner, Soad Khalifa, M.D. (AR 277-79.) Dr. Khalifa reviewed Dr. Banerjee's treating records. (AR 277.) Plaintiff reported depressive and anxiety symptoms, low

---

[2] Plaintiff has not challenged the ALJ's decision related to his physical impairments; thus, only evidence related to Plaintiff's mental conditions has been summarized herein.

[3] According to the American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, ("DSM-IV), a GAF score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations. *See* DSM-IV, at 32. A GAF score between 41 and 50 represents "serious symptoms" or "any serious impairment in social, occupational, or school functioning." *Id.* at 34.

energy, difficulty sleeping, and nervousness. (AR 277.) Plaintiff also indicated that he felt nervous around people. (AR 277.) Plaintiff was living with his parents, but he was isolating himself in his own room. (AR 277.) He reported grief over the death of his sister-in-law and his four nephews who died in a house fire. (AR 277.) Plaintiff denied any suicidal ideation, but noted that he had used heroin. (AR 277.) He last worked in 2002 as a janitor, a position he had held for two years.[4] (AR 278.) Plaintiff stated that he had been on methadone since 1997, and had a legal history that included three charges of driving under the influence of heroin and alcohol. (AR 278.)

On examination, Dr. Khalifa noted that Plaintiff's concentration was impaired, but his persistence and pace were good. (AR 278.) Plaintiff's mood was described as dysphoric, and his affect was congruent. (AR 278.) Plaintiff's memory was found to be intact, and his fund of knowledge was "fair." (AR 279.) Dr. Khalifa diagnosed Plaintiff with dysthymic disorder, and assigned Plaintiff a GAF score of 60. (AR 279.) Dr. Khalifa opined that Plaintiff should be able to understand, carry out, and remember simple instructions. (AR 279.) He noted that Plaintiff would have some restrictions with daily activities and social functioning because of his depressive symptoms and nervousness around people. (AR 279.) Dr. Khalifa indicated that Plaintiff has limited social skills, isolative behavior, and low energy. (AR 279.) He noted that Plaintiff might benefit from changing anti-depressants, as well as supportive and grief therapy. (AR 279.)

State agency reviewing physician, Evangeline Murillo, M.D., reviewed Plaintiff's records in November 2007; on November 21, 2007, she completed a Mental Residual Functional Capacity Assessment as well as a Psychiatric Review Technique form. (AR 284-97.) Dr. Murillo opined that Plaintiff was moderately limited in the ability to understand, remember and carry out detailed instructions and in the ability to work in coordination with or in proximity to others without being distracted by them. (AR 284.) Dr. Murillo also checked a box indicating that Plaintiff's ability to interact appropriately with the general public was moderately limited. (AR 285.) In all other areas of functioning, Dr. Murillo checked boxes indicating that Plaintiff was "not significantly limited." (AR 284-85.) Dr. Murillo concluded that Plaintiff was able to perform simple repetitive tasks on a sustained basis and could complete an eight-hour workday. (AR 285.) However, she noted that

---

[4] It was later clarified that Plaintiff's work as a janitor was performed in 2001. (AR 31.)

3

1  Plaintiff could not work in close proximity to others, but could adapt to changes in a work setting. (AR 285.)

On July 18, 2008, state-agency physician Archimedes Garcia, M.D., reviewed Plaintiff's records and affirmed Dr. Murillo's opinion, agreeing that Plaintiff was able to perform simple, repetitive or routine tasks, but was to avoid working closely with peers. (AR 336.)

Progress notes between October and November 2008 from Tulare County Health & Human Services Agency ("Tulare County Mental Health") indicate that Plaintiff was seen on a recurring basis for major depressive disorder. (AR 432.) He reported ongoing thoughts of helplessness and isolation from family members, as well as difficulties sleeping due to breathing difficulties, which caused him to feel fatigued throughout the day with increasing impairments in his daily living and family-interpersonal relationships. (AR 432-41.)

A December 17, 2008, Tulare County Mental Health progress note indicates that Plaintiff was medication compliant and that Plaintiff denied any adverse effects from his prescribed medication. (AR 466.) Plaintiff reported sleeping and eating well with no current episodes of depressive thoughts or thoughts of suicide. (AR 466.)

In February 2009, Tulare County Mental Health records show that Plaintiff was seen for continuing mental health issues. (AR 450-51.) A "Strengths/Needs Assessment Annual Update" form indicates that Plaintiff had continued to participate in psychiatric treatment, had remained medication compliant, and had noticed a decrease in auditory hallucinations and rapid thoughts. (AR 451.) However, the form also states that Plaintiff continued to struggle with reducing the intensity and frequency of his depression and he often struggled with concerns about his housing situations and wanting to live with his wife and children after being apart from them for eight years. (AR 451.) In terms of Plaintiff's medical needs, the form indicates that Plaintiff continued to report symptoms of major depression including a depressed mood for more days than not, difficulties sleeping, fatigue, anxiety, and some feelings of hopelessness and self isolation. (AR 451.) The form states that these symptoms impair Plaintiff's interpersonal relationships and his ability to seek and obtain employment, which in turn results in financial barriers. (AR 451.)

On February 18, 2009, Plaintiff was seen at Tulare County Mental Health. (AR 464.) Plaintiff reported that he sometimes felt unfocused, but that he was eating well and sleeping four to six hours per night, with occasional episodes of depressive feelings, but no suicidal or homicidal ideation. (AR 464.) Plaintiff was noted to be medication compliant and that the medication was effective at that time. (AR 464.)

On March 9, 2009, Plaintiff saw Dr. Banerjee for "medication follow up." (AR 460.) Plaintiff reported sleeping difficulties and feeling nervous "from being off Methadone." (AR 460.) Plaintiff stated he was very anxious, with body aches, and that he frequently secluded himself. (AR 460.) Plaintiff was noted to be clean and neat, making good eye contact, and he was dressed appropriately. (AR 460.) He was noted to be medication compliant, and no medication side effects were reported; however, Plaintiff did state that he believed his medication was ineffective. (AR 460.)

On April 15, 2009, Plaintiff was again seen at Tulare County Mental Health. (AR 457.) Plaintiff denied any possible side effects from medication at that time, but reported frequent episodes of insomnia and depression. (AR 457.) Plaintiff denied any active thoughts of suicidal or homicidal ideation. (AR 457.)

On July 16, 2009, Plaintiff underwent a psychiatric evaluation by Pedro Eva, M.D. (AR 528.) Dr. Eva reported that Plaintiff was not forthcoming with information during the examination, and he had to be prompted to answer questions. (AR 528.) Plaintiff reported to Dr. Eva that he was depressed and that he spends time at home doing nothing except sitting in bed, watching television, and sleeping. (AR 528.) He denied any suicidal ideation, but he reported being "off" his medication for about three to four months prior to the exam because he was unable to see Dr. Banarjee. (AR 528.) Plaintiff also reported that he had been unable to afford medication or methadone, and had been using heroin for about three months until three weeks before the exam when he "got back on the program." (AR 528.) Dr. Eva observed that Plaintiff was slow to answer questions and appeared depressed, but maintained good eye contact; Plaintiff's speech was slow and monotonous. (AR 529.) Dr. Eva diagnosed Plaintiff with major depressive disorder, moderate

without psychosis. (AR 529.) Dr. Eva assigned Plaintiff a GAF score of 50, but expressly indicated that "[i]t should be noted that he has been off medication for about four months." (AR 529.)

On April 9, 2010, Richard Nunes, M.D., completed a Mental Residual Functional Capacity Assessment form. (AR 638-40.) Dr. Nunes completed the checkbox form by marking the boxes indicating that Plaintiff was moderately limited in his ability to (1) "remember locations and work-like procedures"; (2) understand and remember detailed instructions; (3) carry out detailed instructions; (4) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and (5) respond appropriately to changes in the work setting. (AR 638-39.) Dr. Nunes indicated that Plaintiff was "markedly limited" in his ability to (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances; (3) work in coordination with or proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a constant pace without unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6) accept instructions and respond appropriately to criticism from supervisors; (7) be aware of normal hazards and take appropriate precautions; (8) travel in unfamiliar places or use public transportation; and (9) set realistic goals or make plans independently of others. (AR 638-39.)

Dr. Nunes reported that Plaintiff "has significant problems interacting with others due to his intense anxiety when in groups of people." (AR 640.) Dr. Nunes assigned Plaintiff a GAF score of 49, and indicated that while Plaintiff's depression had "resolved partially with medication," his anxiety continued to be a significant problem. (AR 643.) Dr. Nunes also opined that Plaintiff had marked restrictions of activities of daily living, maintaining concentration, persistence, or pace, and had extreme limitation in maintaining social functioning. (AR 645.) Dr. Nunes further indicated that Plaintiff had suffered three episodes of decompensation, each of extended duration. (AR 645.)

**B.     Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration. (AR 61-86; 90-94.)   Consequently, on August 18, 2008, Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ").[5]  (AR 96.)  A hearing was held June 20, 2010, before ALJ Sharon L. Madsen. (AR 23-50.)

### 1.     Plaintiff's Testimony

Plaintiff testified at the June 20, 2010, hearing through the assistance of counsel.  (AR 23-50.)  Plaintiff indicated that he was currently living at his mother's house, and he received food stamps and General Relief.  (AR 28.)  He completed the 11th grade, but dropped out of high school after turning 18.  (AR 29.)  He reported last being incarcerated in 1994.  (AR 29.)

In 2001, Plaintiff worked for the Cutler-Orosi Unified School District as a janitor through a work-study program.  (AR 31.)  In relation to Plaintiff's depression, he stated he has trouble being around other people.  (AR 36.)  However, Plaintiff reported that being around family, or visiting his children or grandchildren was "okay."  (AR 36.)  His mind is always racing, and he has difficulty concentrating.  (AR 36-37.)  Plaintiff takes Xanax for his anxiety and reported it does help "a little." (AR 38.)

Plaintiff reported that he is able to perform his own personal grooming needs and that he does some housework, including cleaning his room.  (AR 30.)  He is able to make simple food items for himself, such as a sandwich; he does not do any shopping and generally isolates himself in his room.  (AR 30.)  He had once enjoyed working with computers but now has no desire to do so.  (AR 31.)  In a typical day, Plaintiff stays in his room watching television; once in a while he goes out to get the mail or talk with his case worker.  (AR 31.)

Plaintiff testified that he has not taken heroin since 1998, and he stopped drinking alcohol somewhere between 1994 and 1996.  (AR 38.)  He reported continuing in a methadone treatment program.  (AR 38-39.)  He sees a counselor monthly and receives his Methadone from the Bart clinic once a week.  (AR 39.)

Plaintiff also testified that the medication prescribed for his mental conditions were not working at all, and they cause him to feel drowsy and fatigued.  (AR 40.)  As a result, Plaintiff takes three naps a day lasting for about an hour to an hour and a half.  (AR 40.)  Plaintiff's difficulty

---

[5] The Table of Contents indicates that Plaintiff's request for a hearing before an ALJ was made on August 22, 2008, but the form requesting the hearing is dated August 18, 2008.

concentrating precludes him from focusing on one thing for more than 20 minutes. (AR 41.) Three to four times a week Plaintiff experiences really "down" days where he does not do much; these days are usually triggered by thoughts of family. (AR 41.)

        **2.**        **Vocational Expert's Testimony**

A vocational expert ("VE") also testified at the hearing. (AR 42-49.) The ALJ posed several hypothetical scenarios to the VE and inquired whether, in each scenario, such a hypothetical person could perform work. First, the ALJ hypothesized a person of the same age, education, and work background as Plaintiff who had no exertional limitations but was restricted to simple, routine tasks and only occasional contact with the public, co-workers, and supervisors. (AR 42.) The ALJ clarified that, as it pertains to co-workers and supervisors, the limitation would mean that such a person could work in the same building, but the hypothetical person would not be working "side by side" with co-workers and supervisors. (AR 42.) The VE testified there was work that such a hypothetical person could perform including that of commercial cleaner, laborer/landscape, and lumber handler. (AR 43.)

The ALJ posed a second hypothetical, asking the VE again to assume a person with the same age, education, and work history as Plaintiff. The ALJ hypothesized the same limitations, but was only able to lift 50 pounds occasionally and 25 pounds frequently. (AR 43.) The VE testified that a person limited in this way would be able to perform work as an industrial/sweeper/cleaner, as a landscape specialist, and as a hand packer. (AR 43.)

In a third hypothetical, the ALJ hypothesized the same limitations as the first hypothetical, but added an exertional limitation of only being able to lift and carry 20 pounds occasionally and 10 pounds frequently. (AR 43.) The VE testified that such a hypothetical person could perform work as a price marker, an assembler, and a production assembler. (AR 43-44.)

In a fourth hypothetical, the ALJ ask the VE to consider a person with the same limitations as posed in the third hypothetical, but with an additional need to take two-to four-hour breaks of thirty minutes per day, and would need to miss work at least four days a month. (AR 44.) The VE testified that such a hypothetical person would not be able to perform any work with such limitations. (AR 44.)

Plaintiff's representative posed a hypothetical to the VE that involved a person who was moderately limited in the ability to (1) understand, remember, and carry out detailed instructions; (2) work in coordination with or proximity to others without being distracted by them; and (3) interact appropriately with the public. The representative clarified that the use of the words "moderately limited" in the hypothetical denoted experiencing the limitation for up to one-third of an eight-hour workday. (AR 44.) The hypothetical person would also be limited to lifting 20 pounds occasionally and 10 pounds frequently. (AR 44.) The VE testified that such a hypothetical person would be able to perform work as a vending machine attendant, a library page, and a copy clerk. (AR 45-46.)

The representative posed a second hypothetical assuming a person of the same age, education, and having the same work history as Plaintiff who also had marked restrictions of activities of daily living; extreme difficulties in maintaining social functioning; and marked difficulties in maintaining concentration, persistence, or pace. (AR 46.) The representative clarified that, as used in the hypothetical, "marked limitation" was to be considered one that "may arise when several activities or functions are impaired or even when only one is impaired so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately, and effectively. " (AR 47.) The VE testified that such a person could perform no work. (AR 47.)

In a third hypothetical posed by the representative, the VE was asked to consider a person who was exactly like the second hypothetical person but who was also "markedly limited" in the ability to: (1) maintain attention and concentration for extended periods; (2) work in coordination with or in proximity to others without being distracted by them; (3) complete a normal workday and workweek without interruptions from psychologically-based symptoms; and (4) perform tasks at a consistent pace without an unreasonable number and length of rest periods. Using the same definition of "marked limitation" from the second hypothetical, the VE testified that such a person would not be able to perform any work. (AR 47.)

In a fourth and final hypothetical, the VE was asked by Plaintiff's representative to consider a person who was markedly limited in the ability to: (1) perform activities within a schedule, maintain regular attendance, and be punctual with customary allowances; and (2) complete a normal

workday and workweek without interruptions from psychologically based symptoms. (AR 48.) The VE testified that a person with those limitations could not perform any work. (AR 48.)

### 3. The ALJ's Decision

On August 13, 2010, the ALJ issued a decision that found Plaintiff not disabled from May 18, 2007, through the date of the decision. (AR 10-17.) Specifically, the ALJ found that Plaintiff (1) has not engaged in substantial gainful activity since May 18, 2007; (2) has four severe impairments: major depressive disorder, social anxiety disorder, obesity, and mild degenerative joint disease of the hips; (3) does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) has a Residual Functional Capacity ("RFC")[6] to lift and carry 50 pounds occasionally and 25 pounds frequently; is able sit, stand, and walk for six hours in an eight-hour workday, and can perform simple, routine tasks with occasional contact with the public, co-workers, and supervisors; (5) has no past relevant work; and (6) can perform jobs existing in significant numbers in the national economy. (AR 10-17.)

On October 1, 2010, Plaintiff sought review of this decision before the Appeals Council. (AR 6.) The Appeals Council denied review on July 18, 2011. (AR 1-5.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 416.1481.

## C. Plaintiff's Contentions on Appeal

On September 9, 2011, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision. Plaintiff seeks a reversal of the final decision of the Commissioner asserting that the ALJ failed to properly consider the opinion of Dr. Nunes and erroneously found Plaintiff's lay statements not credible. (Doc. 12.)

---

[6] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

## SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id.* §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient RFC despite the impairment or various limitations to perform her past work. *Id.* §§ 404.1520(f), 416.920(f). If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id.* §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## **DISCUSSION**

**A.    The Weight of the Medical Evidence**

    **1.    Legal Standard**

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, a treating physician's opinion should be given more weight than opinions of doctors who did not treat the claimant, because treating physicians are employed to cure and, therefore, have a greater opportunity to know and observe the claimant. *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). Opinions given by examining physicians are, in turn, generally given greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); *Gallant v. Heckler*, 750 F.2d 1450 (9th Cir. 1984). Where an

examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the examining physician's ultimate conclusions. *Lester,* 81 F.3d at 830.

Despite the presumption of special weight afforded to treating or examining physicians' opinions, an ALJ may give less weight to an examining physician's opinion that conflicts with the medical evidence, if the ALJ provides specific and legitimate reasons for discounting the opinion. *See id*. at 830-31 ("[T]he opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record."). The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). A non-examining physician's opinion alone, with nothing more, is not sufficient evidence to justify the rejection of an examining physician's opinion. *Lester*, 81 F.3d at 831 (citing *Pitzer*, 908 F.2d at 506 n. 4; *Gallant*, 753 F.2d at 1456). However, the ALJ can reject the opinion of an examining physician based on the testimony of a non-examining medical advisor <u>and</u> on substantial evidence in the record. *See, e.g.*, *Magallanes v. Bowen*, 881 F.2d 747, 751-55 (9th Cir. 1989); *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995); *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir 1995).

### 2.     The ALJ's Assessment of Dr. Nunes' Opinion

Plaintiff challenges the ALJ's assessment of the medical evidence relevant to Plaintiff's mental functioning. The ALJ determined that Plaintiff's mental impairments limited him to simple, routine tasks with only occasional contact with the public, co-workers, and supervisors. (AR 13.) In making this RFC assessment, the ALJ considered medical records and opinions from Drs. Khalifa, Eva, Murillo, Garcia, and Nunes as well as Plaintiff's statements describing his symptoms and their severity. (AR 12-16.) In weighing Dr. Nunes' opinion that Plaintiff was markedly to extremely limited in most areas of functioning, the ALJ gave little weight to this opinion. (AR 16.) Specifically, the ALJ reasoned that Dr. Nunes opined that Plaintiff's limitations became effective in January 2007, but Dr. Nunes had only been treating Plaintiff for the three months prior to Dr. Nunes' April 2010 opinion. (AR. 16.) Further, the ALJ found it "significant that no treating or attending

physicians imposed significant functional limitations upon the claimant until he requested his doctor to complete a residual functional capacity questionnaire in April 2010." (AR 16.)

### a. Plaintiff's Argument

Plaintiff asserts that the ALJ's reasoning that no other treating or attending physicians imposed such significant functional limitations is incorrect. (Doc. 12, p. 12.) Plaintiff argues that Dr. Eva assigned Plaintiff a GAF score of 50, which is almost the same as the GAF score of 49 that Dr. Nunes assigned in April 2010. (Doc. 12, p. 12.) According to Plaintiff, both of these GAF scores reflect serious symptoms with serious impairments. Plaintiff thus contends that the ALJ's conclusion that no other treating physician found Plaintiff as limited as Dr. Nunes is incorrect and not supported by substantial evidence in the record. (Doc. 12, p. 12.)

### b. The Commissioner's Argument

The Commissioner argues that the ALJ properly assessed Dr. Nunes' opinion. (Doc. 16, 7:22-11:5.) Specifically, the Commissioner notes that Plaintiff did not dispute the ALJ's finding that the limited length of the treating relationship between Plaintiff and Dr. Nunes detracts from Dr. Nunes' opinion, and therefore Plaintiff has conceded that this reasoning constitutes legally sufficient grounds to assign less weight to the opinion. As to the similarity between the GAF scores assigned by Dr. Nunes and Dr. Eva, the Commissioner asserts that the GAF score assigned by Dr. Eva must be viewed in the context of the assessment, i.e., the GAF score was assigned three weeks after a three-month period of heroin abuse. (AR 528.) Dr. Eva also noted that, at the time of the GAF score, Plaintiff had been off medication for his mental conditions for approximately four months. (AR 529.) Given this context, the GAF score assigned by Dr. Nunes at a time when Plaintiff was taking medication and had experienced a positive response to medication, is not supported by Dr. Eva's GAF score. (Doc. 16, 8:20-9:7.)

The Commissioner also argues that the GAF score assessed by Dr. Nunes was "not actually a medical source opinion because it was not prepared for any of the purposes of a medical opinion as defined by the Commissioner's regulations." (Doc. 16, 8:8-10.) The Commissioner cites 20 C.F.R. § 416.927(a)(2) which provides that "[m]edical opinions are statements from physician and psychologists or other acceptable medical sources that reflect judgments about the nature and

severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."

Finally, the Commissioner contends that the findings made by Dr. Nunes conflict with not only the state-agency non-examining physicians, but also Dr. Khalifa, an examining physician, and Dr. Banerjee, Plaintiff's treating physician. As such, the ALJ's decision to give Dr. Nunes' opinion less weight is supported by substantial evidence in the record.

### c. Analysis

As noted above, a GAF score is the "clinician's judgment of the individual's overall level of function." DSM IV at 32. While the GAF score does not provide detailed information,[7] it is nonetheless a statement that reflects a physician's judgment about the nature or severity of a patient's current condition. Thus, a GAF score assigned by a physician is a medical opinion about the level of the patient's functioning *at that time*. However, the ALJ is not required to give any GAF score controlling weight. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy. Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate."); *see also Baker v. Astrue*, No. CV 08-3199-MLG, 2009 WL 279085, at *3 (C.D. Cal. Feb. 4, 2009) ("In evaluating the severity of a claimant's mental impairments, a GAF score may help to guide the ALJ's determination, but an ALJ is not bound to consider it."). Because a GAF score provides no discussion of the symptoms assessed to assign the score, and generally reflects a patient's current functioning (as opposed to long-term functioning), a GAF score may not have much probative value for purposes of assessing a claimant's ability to work. *See, e.g., Ramos v. Barnahrt*, 513 F. Supp. 2d 249, 261 (E.D. Pa. 2007) ("Clinicians use a GAF scale to identify an individual['s] overall level of functioning, and a lower score may indicate problems that do not necessarily relate to the ability to hold a job.") (internal quotation marks and citations omitted).

---

[7] *See Petree v. Astrue*, 260 F. App'x 33, 42 (10th Cir. 2007) (unpublished disposition) ("[A] low GAF score does not alone determine disability, but is instead a piece of evidence to be considered with the rest of the record.").

Plaintiff notes that the GAF score Dr. Eva assigned to Plaintiff is similar to the score assigned by Dr. Nunes. Plaintiff contends the similarity of two GAF scores undercuts the ALJ's reasons for rejecting Dr. Nunes' opinion – i.e., that no other treating or attending physician imposed significant functional limitations as those imposed by Dr. Nunes. However, a GAF score does not reflect functional limitations per se; rather, it is a way to quantify the level of symptom-severity at a particular time. Moreover, a GAF score does not provide any information about what particular symptoms contributed to the scoring assessment. Thus, similar GAF scores do not necessarily translate to similar symptoms or impairments, particularly when the two assessments compared are temporally attenuated. Moreover, Dr. Eva's GAF score was assessed at a time when Plaintiff was both non-compliant with his depression medication and had also been using heroin in the months prior to the examination. (AR 528 (Plaintiff reported to Dr. Eva that "[h]e abused heroin until about three weeks ago. He is currently on a methadone program").) The Commissioner correctly notes that the context of Dr. Eva's GAF score makes it a less reliable indicator of Plaintiff's functioning over the long-term, and does not necessarily support the findings of Dr. Nunes, even though both doctors assigned a similar GAF score to Plaintiff.

Further, as the Commissioner argues, reviewing the medical record as a whole bears out the ALJ's consideration of Dr. Nunes' opinion. Dr. Kahlifa, the state-agency examining physician, described Plaintiff as having "mildly depressive symptoms." (AR 279.) Likewise, in reviewing the medical records, Dr. Murillo determined that Plaintiff's symptoms did not prevent him from completing simple, repetitive tasks on a sustained basis, but noted that Plaintiff could not work in close proximity to others. (AR 285.) In light of this, the GAF score assigned by Dr. Nunes, coupled with the marked and extreme limitations imposed, are not consistent with the generally moderate to mild symptoms and limitations noted by Dr. Kahlifa and confirmed by Dr. Murillo. In sum, the GAF score assigned by Dr. Eva does not invalidate the ALJ's reasoning that the extreme limitations imposed by Dr. Nunes were inconsistent with the other opinions of record regarding Plaintiff's level of functioning.

Moreover, the ALJ also determined that Dr. Nunes' opinion was entitled to less weight because he had only treated Plaintiff once a month over three months. The ALJ noted that, although

Dr. Nunes opined Plaintiff's limitations "became effective" as of January 12, 2007, he had only been treating Plaintiff since 2010. (AR 645.) It is not clear how Dr. Nunes concluded the limitations he imposed had been at that level of severity since 2007. Thus, because of the short length of the treating relationship and the lack of treatment history prior to 2010, the ALJ gave the opinion less weight. The ALJ provided legally sufficient grounds, supported by substantial evidence in the record, to give less weight to Dr. Nunes' opinion.

**B.     The ALJ Gave Legally Sufficient Reasons to Find Plaintiff's Statements Not Credible**

Plaintiff argues generally that the ALJ offered no clear and convincing reasons to reject Plaintiff's credibility because the medical record supports Plaintiff's statements about the severity of his mental condition, particularly the reports of Drs. Eva and Nunes.

As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529, 416.929. Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

The ALJ found that, while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent Plaintiff alleged symptoms more severe than those reflected by the RFC assessment. (AR 15.) The ALJ noted that Plaintiff had a history of incarceration, substance abuse, and a minimal work history, which all detracted from his credibility. (AR 15.) Specifically, the ALJ noted an inconsistency in Plaintiff's statements regarding his substance abuse history. (AR 15.) Moreover, although Plaintiff had alleged various side effects from his use of medications, the medical records do not corroborate these

allegations. (AR 15.)   Rather, according to the ALJ, the treatment notes indicate the medications were effective and Plaintiff denied medication side effects on several occasions. (AR 15.)

In considering the ALJ's rationale, it must be noted that a mere history of past incarceration is not a clear and convincing reason to reject Plaintiff's testimony as not credible.  For example, in *Buck v. Astrue*, the ALJ found the claimant not credible because he had been incarcerated in the past. No. 3:10-cv-05519-KLS, 2011 WL 2600505, at *11 (W.D. Wash. June 28, 2011). In rejecting this as a clear and convincing rationale to discredit the claimant, the court reasoned that "the mere fact that a claimant has been incarcerated or has a criminal history alone is not a sufficient basis upon which to base an adverse credibility determination, given that such reveals nothing about the claimant's honesty or lack thereof." *Id.*  This reasoning is convincing.  Here, Plaintiff stated that he had been incarcerated four times due to drug use, which has little bearing on his veracity.  The ALJ did not attribute any portion of Plaintiff's criminal history as probative of whether Plaintiff was honest or truthful.

As to Plaintiff's substance abuse history, while a lack of candor regarding substance abuse may constitute a clear and convincing reason to reject lay statements (*see Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (upholding credibility determination where claimant presented conflicting information about her drug and alcohol use)), there must be more than a mere history of substance abuse to discredit a plaintiff's testimony (*see Woodsum v. Astrue*, 711 F. Supp. 2d 1239, 1262 (W.D. Wash. 2010) ("discounting plaintiff's credibility because of her substance abuse . . . history was improper, given that it bears little relevance to plaintiff's tendency to tell the truth")). Here, the ALJ noted that Plaintiff had contrarily alleged that he had been clean and sober since 1998 as it related to heroin use, but he reported to Dr. Eva in July 2009 that he was unable to afford Methadone and was therefore using heroin for about three months prior the examination. (AR 15, 528.)  Such an inconsistency in testimony regarding Plaintiff's substance abuse history is a legally sufficient grounds to discredit his lay statements. *Thomas*, 278 F.3d at 959.

Further, a minimal work history coupled with inconsistent statements regarding medication side effects also constitute legally sufficient grounds to discredit Plaintiff's testimony.  A minimal work history is a legitimate factor for the ALJ to consider in relationship to Plaintiff's overall

credibility. *See Thomas*, 278 F.3d at 959 (poor job history reflecting years of unemployment before alleged onset of disability is a clear and convincing reason to discredit the plaintiff).

Here, Plaintiff has a very minimal work history, even prior to his alleged disability onset date of 2002. (AR 15, 186.) The ALJ properly considered this factor in making the credibility determination. *Id*. Further, the ALJ also considered inconsistent statements made by Plaintiff regarding medication side effects. (AR 15.) Specifically, Plaintiff testified in the hearing that he experienced medication side effects, but the medical records indicate that Plaintiff denied medication side effects. (*Compare* AR 40 (testifying to medication side-effect) *with* AR 445, 457, 460, 462, 464 (denying medication side-effects to physicians/counselors). This too was a legitimate factor for the ALJ to consider.

Although a mere history of incarceration was not an adequate ground to discredit Plaintiff, the ALJ provided other clear and convincing reasons supported by substantial evidence to reject Plaintiff's lay statements. "So long as there remains 'substantial evidence supporting the ALJ's conclusions on credibility' and the error 'does not negate the validity of the ALJ's ultimate credibility conclusion,' such [error] is deemed harmless." *Carmichael v. Comm'r of Soc. Sec. Admin.*, 553 F.3d 1155, 1162 (9th Cir. 2008) (quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004)). Thus, any error on the part of the ALJ by considering one improper credibility factor is harmless, and the ALJ's credibility determination is legally sufficient.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Ruben Garcia Hinojos.

IT IS SO ORDERED.

Dated:   **December 28, 2012**          /s/ Sheila K. Oberto
                                      UNITED STATES MAGISTRATE JUDGE